Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Frank P. Tiscione, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Liberty Mutual Insurance Company,*
*Liberty Mutual Fire Insurance Company, Liberty Insurance*
*Corporation, The First Liberty Insurance Corporation, LM*
*Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance*
*Company, Liberty County Mutual Insurance Company, LM*
*Property and Casualty Insurance Company, Safeco Company*
*of Indiana, and American States Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LIBERTY MUTUAL INSURANCE COMPANY,
LIBERTY MUTUAL FIRE INSURANCE COMPANY,
LIBERTY INSURANCE CORPORATION, THE
FIRST LIBERTY INSURANCE CORPORATION, LM
INSURANCE CORPORATION, LIBERTY MUTUAL
MID-ATLANTIC INSURANCE COMPANY,
LIBERTY COUNTY MUTUAL INSURANCE
COMPANY, LM PROPERTY and CASUALTY
INSURANCE COMPANY, SAFECO COMPANY OF
INDIANA, and AMERICAN STATES INSURANCE
COMPANY,

Docket No.:_____ (       )

**Plaintiff Demands a Trial by Jury**

                                    Plaintiffs,

          -against-

LEONID KHLEVNER, NORTHEAST MEDICAL
DEVICES, LLC, WALMED EQUIPMENT, LLC, and
JOHN DOE DEFENDANTS "1" THROUGH "10",

                                    Defendants.
-----------------------------------------------------------------X

## <u>COMPLAINT</u>

          Plaintiffs, Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company,

Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance

Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company (collectively "Liberty Mutual" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## <u>INTRODUCTION</u>

1.      This action seeks to recover more than $184,000.00 that Defendants have wrongfully obtained from Liberty Mutual by submitting, and causing to be submitted, hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (<u>e.g.</u> cervical collars, lumbar-sacral supports, orthopedic pillows, massagers, electronic heat pads, egg crate mattresses, pneumatic compression devices, <u>etc.</u>) (collectively, the "Fraudulent Equipment") through Defendants Northeast Medical Devices, LLC ("Northeast Devices") and Walmed Equipment, LLC ("Walmed Equipment") (collectively, the "Supplier Defendants").

2.      The Supplier Defendants are retailers of DME and OD and are owned by Leonid Khlevner ("Khlevner") (Khlevner, collectively with Northeast Devices are referred to herein as the "Northeast Defendants" and Khlevner, collectively with Walmed Equipment are referred to herein as the "Walmed Equipment Defendants"). Khlevner, working with others who are not readily identifiable to Liberty Mutual (hereinafter, the "John Doe Defendants"), engaged in a scheme to obtain fraudulent prescriptions from various healthcare providers (the "Referring Providers") that were, in turn, used to submit large volumes of billing to Liberty Mutual and other New York automobile insurance companies for providing Fraudulent Equipment that was medically unnecessary, illusory, and otherwise not reimbursable.

3.      Based upon the prescriptions purportedly issued by the Referring Providers, Defendants used the Supplier Defendants to provide Fraudulent Equipment to individuals who

claimed to have been:  (i) involved in automobile accidents in New York; and (ii) eligible for coverage under no-fault insurance policies issued by Liberty Mutual ("Insureds").

4.      Khlevner devised a comprehensive and integrated scheme to exploit New York's No-Fault insurance system by targeting the prescription and dispensing of purported DME and OD through Walmed Equipment. Thereafter, Khlevner began to dispense Pneumatic Compression Devices through Northeast Devices because he could bill Liberty Mutual and other New York automobile insurance companies over $5,000.00 for each patient who received one of the Pneumatic Compression Devices and the attendant equipment.

5.      Liberty Mutual seeks to recover more than $184,000.00 that has been wrongfully obtained by the Defendants and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $530,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the Defendants, because:

(i)      The Defendants billed Liberty Mutual for Fraudulent Equipment purportedly provided to Insureds even though Defendants were ineligible to collect No-Fault Benefits, because they were not lawfully licensed to provide the Fraudulent Equipment since the Supplier Defendants were not lawfully licensed;

(ii)     the Defendants billed Liberty Mutual for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful financial arrangements;

(iii)    the Defendants billed Liberty Mutual for Fraudulent Equipment that was not medically necessary and provided – to the extent provided at all – pursuant to prescriptions issued by the Referring Providers without regard for genuine patient care and as a result of predetermined fraudulent protocols, in order to financially enrich the Defendants and others not presently known;

(iv)     the Defendants billed Liberty Mutual for Fraudulent Equipment that was provided – to the extent provided at all – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

(v)      the bills for Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the Healthcare

Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds; and

(vi)    the bills for Fraudulent Equipment submitted to Liberty Mutual by the Defendants fraudulently misrepresented that the charges were permissible and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

6.    The Defendants fall into the following categories:

(i)    Defendant Northeast Devices is a Delaware corporation authorized to conduct business in New York that purports to provide Fraudulent Equipment to automobile accident victims, and bills New York automobile insurance companies, including Liberty Mutual, for Fraudulent Equipment;

(ii)    Defendant Walmed Equipment is a Delaware corporation authorized to conduct business in New York that purports to purchase DME and OD from wholesalers, purports to provide Fraudulent Equipment to automobile accident victims, and bills New York automobile insurance companies, including Liberty Mutual, for Fraudulent Equipment;

(iii)    Defendant Khlevner is the owner of Northeast Devices and Walmed Equipment, and together with the John Doe Defendants, collaborated to submit bills to Liberty Mutual and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims; and

(iv)    John Doe Defendants "1" through "10" are citizens of New York and are presently not identifiable but are individuals who participated in the fraudulent scheme perpetrated against Liberty Mutual by, among other things, assisting with the operation of the Supplier Defendants, engaging in illegal financial and kickback arrangements to obtain patient referrals for the Supplier Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

7.    As discussed below, the Defendants always have known that the claims for Fraudulent Equipment submitted to Liberty Mutual were fraudulent because: (i) the Defendants were not lawfully licensed to provide the Fraudulent Equipment; (ii) the Fraudulent Equipment was provided – to the extent provided at all – based upon prescriptions received as a result of unlawful financial arrangements; (iii) the prescriptions for the Fraudulent Equipment were not medically necessary and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants; (iv) the Fraudulent

Equipment was provided – to the extent provided at all – as a result of decisions made by laypersons, not by healthcare providers; (v) bills for the Fraudulent Equipment fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided; and (vi) the bills for the Fraudulent Equipment fraudulently misrepresented that the charges were permissible and grossly inflated the permissible reimbursement rate that the Defendants could have received.

8.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to Liberty Mutual through the Supplier Defendants.

9.      The charts attached hereto as Exhibits "1" and "2" set forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, by Defendants to Liberty Mutual pursuant to the fraudulent scheme.

10.     The Defendants' fraudulent scheme against Liberty Mutual and the New York automobile insurance industry began no later than 2021 and continued uninterrupted since that time.

11.     As a result of the Defendants' fraudulent scheme, Liberty Mutual has incurred damages of more than $184,000.00.

## THE PARTIES

### I.      Plaintiffs

12.     Plaintiffs Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are Massachusetts corporations with their principal place of business in Boston, Massachusetts.  Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

13.     Plaintiffs Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are Illinois corporations with their principal place of business in Boston, Massachusetts.  Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

14.     Plaintiff Liberty Mutual Fire Insurance Company is a Wisconsin corporation with its principal place of business in Boston, Massachusetts.  Liberty Mutual Fire Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

15.     Plaintiff Liberty County Mutual Insurance Company is a Texas corporation with its principal place of business in Boston, Massachusetts.  Liberty County Mutual Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

16.     Plaintiffs LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are Indiana corporations with its principal place of business in Boston, Massachusetts.  LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

**II.      Defendants**

17.     Defendant Northeast Devices is a Delaware corporation with its principal place of business in Brooklyn, New York. Northeast Devices was incorporated on June 9, 2021 and became authorized to conduct business in New York on or around March 28, 2022.  Northeast Devices is owned on paper by Khlevner.  Khlevner, along with the John Doe Defendants, used Northeast

Devices as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

18.     Defendant Walmed Equipment is a Delaware corporation with its principal place of business in Brooklyn, New York. Walmed Equipment was incorporated on October 18, 2021 and became authorized to conduct business in New York on or around March 4, 2022.  Walmed Equipment is owned on paper by Khlevner. Khlevner, along with the John Doe Defendants, used Walmed Equipment as a vehicle to submit fraudulent billing to Liberty Mutual and other New York automobile insurers.

19.     Defendant Khlevner resides in and is a citizen of New York.  Khlevner is the record owner of the Supplier Defendants.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

22.     Liberty Mutual underwrites automobile insurance in the State of New York.

## I.        An Overview of the Pertinent Laws

### A.        Pertinent Laws Governing No-Fault Insurance Reimbursement

23.        New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

24.        Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

25.        In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

26.        In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

27.        Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

28.        For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

29.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.  In <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.</u>, 33 N.Y.3d 389 (2019), the New York Court of Appeals reiterated that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits and noted concerns with having unlicensed persons involved in practicing medicine since they are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

30.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME and OD.

31.     Specifically, New York City's Administrative Code requires DME/OD suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer Affairs ("DCA") in order to lawfully provide DME or OD to the disabled, which is defined as "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". <u>See</u> 6 RCNY § 2-271; NYC Admin. Code §20-425.

32.     It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License.  <u>See</u> NYC Admin. Code §20-426.

33.     A Dealer in Products License is obtained by filing a license application with the DCA. The application requires that the applicant identify, among other pertinent information, the commercial address of where the DME/OD supplier is physically operating from.

34.     The license application for a Dealer in Products License also requires the applicant to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The affirmation to the application requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

35.     New York law also prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

36.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

37.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

38.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

39.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to Liberty Mutual, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

40.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to Liberty Mutual, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME and OD**

41.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

42.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

43.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars, lumbar supports, knee supports, ankle supports, wrist braces, and the like.

44.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

45.     In a June 16, 2004, Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

46.     As it relates to DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

(a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1) the acquisition cost (i.e., the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2.

47.     As indicated by the New York Fee Schedule, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

48.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

49.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

50.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

51.     Where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as Liberty Mutual to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

52.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any

documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

53. To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME Procedure Codes, the definitions for set forth by Palmetto control to determine whether an item of DME or OD qualify for reimbursement under a specific HCPCS Code.

54. Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted and/or customized. Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

55. The maximum reimbursement rates for providing DME or OD to automobile accident victims under the No-Fault Laws set forth above includes all shipping, handling, and delivery. See 12 N.Y.C.R.R. § 442.2(c). As such, DME/OD suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up of any DME or OD.

56. Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

    (i)    The provider is in compliance with all significant statutory and regulatory requirements;

    (ii)    The provider received a legitimate prescription for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

    (iii)    The prescription for DME or OD is not based on any unlawful financial arrangement;

(iv)    The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(v)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(vi)    The fee sought for DME or OD provided to an Insured was not in excess of the price contained in the Medicaid Fee Schedule or the standard used for a Non-Fee Schedule item.

## II.    Defendants' Fraudulent Scheme

### A.    Overview of the Defendants' Fraudulent Scheme

57.    Beginning in or about January 2021, Defendants masterminded and implemented an egregious, integrated fraudulent scheme in which they used the Supplier Defendants to exploit patients for financial gain by billing the New York automobile insurance industry for hundreds of thousands of dollars in No-Fault Benefits for the Fraudulent Equipment purportedly dispensed to the Insureds.

58.    The Supplier Defendants received prescriptions from "No-Fault" medical clinics ("the Clinics") for the Fraudulent Equipment and the Supplier Defendants submitted billing to Liberty Mutual using HCPCS Codes reimbursement rates, making false representations regarding the Fraudulent Equipment purportedly provided to Insureds.  In fact, the scheme consisted of Walmed Equipment first submitting billing for certain Fraudulent Equipment and, thereafter, Northeast Devices dispensing Pneumatic Compression Devices on the same Insureds.

59.    The Defendants utilized this scheme to artificially lower the total amounts billed to Liberty Mutual through any one entity and to avoid detection of the scheme by Liberty Mutual, *i.e.*, Walmed Equipment would dispense regular DME and OD, while Northeast Devices would strictly dispense Pneumatic Compression Devices (and attendant appliances/sleeves).

60.     The Defendants began billing Liberty Mutual through Walmed Equipment on January 26, 2021 and continued to submit billing until January 23, 2023.  As part of their scheme to systematically defraud Liberty Mutual, Defendants, in conjunction with billing for Walmed Equipment, started billing Pneumatic Compression Devices through Northeast Devices from January 7, 2022 until June 12, 2023.

### 1.     The Common Scheme Involving Fraudulent Equipment

61.     Khlevner and the John Doe Defendants used the Supplier Defendants to obtain No-Fault Benefits submitting fraudulent bills to Liberty Mutual and other automobile insurers seeking reimbursement for Fee Schedule and Non-Fee Schedule items.

62.     The Defendants were able to perpetrate the fraudulent scheme against Liberty Mutual described below by obtaining prescriptions for Fraudulent Equipment because of secret agreements with third-party individuals at the Clinics.

63.     The Referring Providers purportedly issued prescriptions for Fraudulent Equipment to virtually every Insured that was injured in a motor vehicle accident and treated at a particular Clinic, and many of those prescriptions were provided to the Defendants in exchange for various forms of consideration that the Defendants provided to others associated with the Clinics.

64.     As part of the fraudulent scheme, both Walmed Equipment and Northeast Devices received prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers from the following Clinics:

(i)      1122 Coney Island Avenue, Brooklyn;

(ii)     1849 Utica Avenue, Brooklyn;

(iii)    409 Rockaway Avenue, Brooklyn;

(iv)     204-12 Hillside Avenue, Hollis;

(v)      607 Westchester Avenue, Bronx; and

(vi)     788 Southern Boulevard, Bronx.

65.     Defendants received prescriptions for Fraudulent Equipment issued by the Referring Providers directly from the Clinics and without going through the Insureds.

66.     As part of the scheme, and to maximize the amount of money that the Defendants could obtain from Liberty Mutual, and other automobile insurers, the prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers and provided to the Defendants were generic and vague in that the descriptions on the prescription forms could apply to multiple types of DME or OD.

67.     Once the Defendants received the vague and generic prescriptions, they would submit either NF-3 or HCFA-1500 forms to Liberty Mutual seeking reimbursement for specific types of Fee Schedule and Non-Fee Schedule items with HCPCS Codes that were not directly identified or not clearly identified in the prescriptions.

68.     By submitting bills to Liberty Mutual seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Defendants represented that they provided Insureds with the particular item associated with each unique HCPCS Code and that the specific item was medically necessary, when, in fact, the Fraudulent Equipment purportedly provided to Insureds and the HCPCS Codes referenced on the bills were actually based upon the decisions by individuals not licensed to prescribe DME and/or OD, such as Khlevner, together with the John Doe Defendants.

69.     The Defendants also tried to maximize the amount of No-Fault Benefits that they could obtain from Liberty Mutual, and other automobile insurers, by submitting bills to Liberty Mutual that misrepresented the Fraudulent Equipment purportedly provided to Insureds – to the extent actually provided at all.

70.     In a substantial majority of the charges for Fee Schedule items, the Fraudulent Equipment for Fee Schedule items did not match the HCPCS Codes identified in the bills submitted by Defendants to Liberty Mutual.

71.     For example, the Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment that did not contain all the features required by the HCPCS Codes identified on the Defendants' bills to Liberty Mutual.

72.     The Defendants' submission of bills to Liberty Mutual, and other automobile insurers, seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent the Fraudulent Equipment purportedly provided to the Insureds was part of the scheme in order to obtain higher reimbursement rates.

73.     The Defendants also submitted bills for Non-Fee Schedule items that falsely represented they were seeking reimbursement at the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public for the same item.  In actuality, the bills submitted by Defendants to Liberty Mutual for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public.

74.     In addition, the Defendants submitted bills to Liberty Mutual indicating the Non-Fee Schedule items purportedly provided to Insureds were expensive and high-quality, when the items provided were actually cheap and poor-quality, and purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.  In fact, the cheap and poor quality items provided to the Insureds were easily obtainable from legitimate internet or brick-and-mortar retailers for a small fraction of the reimbursement rates identified in the bills submitted to Liberty Mutual by the Defendants.

75.     As a matter of course, the Defendants billed Liberty Mutual for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fee Schedule items that did not represent the HCPCS codes contained in the bills to Liberty Mutual; (iv) Non-Fee Schedule items at grossly inflated reimbursement rates; and (v) Fraudulent Equipment that was otherwise not reimbursable.

**B.     Defendants' Failure to Comply with Local Licensing Requirements**

76.     It is unlawful to engage in the business of selling, renting, fitting or adjusting DME or OD to the disabled without obtaining proper licensing from DCA. See NYC Admin. Code §20-426.

77.     Further, for a DME/OD supplier to provide DME or OD to automobile accident victims within the City of New York, the DME/OD supplier must receive a Dealer in Products License from the DCA.

78.     An overwhelming majority of the Insureds identified in Exhibits "1" and "2" were located within the City of New York.

79.     As such, for the Defendants to lawfully provide DME/OD to the Insureds identified in Exhibits "1" and "2", they were required to obtain a Dealer in Products License from the DCA.

80.     The Supplier Defendants were never licensed with DCA and, therefore, were not eligible for reimbursement of No-Fault Benefits.

81.     To bill for or to collect No-Fault Benefits, a supplier of DME and/or OD must meet all state and local licensing requirements.  See 11 N.Y.C.R.R. § 65-3.16(a)(12).

82.     Since the Defendants failed to obtain such licensing from DCA, the Defendants were never authorized to sell or adjust DME or OD to any Insured in New York City.

83.     Accordingly, even absent Defendants' other fraudulent conduct as more fully described in this Complaint, they were never eligible to bill or collect No-Fault Benefits from Liberty Mutual or any other automobile insurer since the Supplier Defendants failed to comply with local licensing requirements.

### C.     Defendants' Illegal Financial Arrangements

84.     To obtain access to Insureds, the Defendants entered into illegal agreements with unidentified persons associated with the Clinics where prescriptions for Fraudulent Equipment were provided to the Defendants in exchange for financial consideration.

85.     From the inception of Walmed Equipment and Northeast Devices' operations, the Defendants engaged in unlawful kickback arrangements to obtain prescriptions for Fraudulent Equipment from the Clinics, which allowed the Defendants to submit hundreds of claims for Fraudulent Equipment to Liberty Mutual and other New York automobile insurers.

86.     Pursuant to the unlawful financial arrangements, the Defendants would pay kickbacks or other financial consideration to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers at the Clinics.

87.     For example, Clinics located at 409 Rockaway Avenue, Brooklyn, New York (the "409 Rockaway Avenue Clinic") and 204-12 Hillside Avenue, Hollis, New York (the "204-12 Hillside Avenue Clinic") which were sources of prescriptions for Fraudulent Equipment provided to the Defendants, were named in criminal prosecutions involving complex no-fault insurance schemes. See USA v. Rose, 1:19-cr-00789-PGG (S.D.N.Y. 2019); USA v. Gulkarov; 1:22-cr-00020-PGG (S.D.N.Y. 2022). The criminal prosecutions identify the 409 Rockaway Avenue Clinic and the 204-12 Hillside Avenue Clinic as locations run by laypersons using bribery and money laundering to generate falsified billing to submit to insurance carriers. Id.

88.     In addition, Dr. Patricia Kelly, D.O., a physician who allegedly authorized numerous prescriptions for Fraudulent Equipment submitted by Walmed Equipment in support of its claims, has affirmed that, among other things, (i) she virtually never prescribed any DME aside from a brace on very rare occasions; (ii) she did not prescribe DME items to Walmed Equipment; (iii) it was not her signature on the prescription forms for DME items prescribed to Walmed Equipment; (iv) the primary Clinic location where she worked was controlled by laypersons; and (v) the testing, treatment, DME and prescriptions issued were part of a protocol to increase the medical billing to the patient's insurance company.

89.     Further, another purported Referring Provider, Phyllis Gelb, M.D., advised Liberty Mutual that DME provided by Walmed Equipment was not actually prescribed by her even though her name is on the prescription form. In fact, she never made prescriptions to Walmed Equipment. In addition, Dr. Gelb advised Liberty Mutual that if she would ever prescribe DME, which was rare, it would only be for cervical pillows and possibly a TENS unit, although Walmed Equipment purportedly dispensed many other DME items that was purportedly prescribed by Dr. Gelb.

90.     The fact that the prescriptions for Fraudulent Equipment were the result of unlawful kickback arrangements is also demonstrated in part by the fact that the prescriptions were not medically necessary and were provided pursuant to predetermined fraudulent protocols.

91.     As explained in more detail below, the Defendants received prescriptions purportedly issued by Referring Providers working at various Clinics, including a Clinic located at 1122 Coney Island Avenue, Brooklyn ("Coney Island Clinic"). The prescriptions for Fraudulent Equipment from each Referring Provider were not medically necessary as they contained a predetermined set of Fraudulent Equipment.

92.     For example, multiple charges identified in Exhibits "1" and "2" are based upon prescriptions for Fraudulent Equipment that were never actually issued, signed, or otherwise

authorized by the Referring Provider. Instead, the prescriptions for Fraudulent Equipment were created by others not presently identifiable and were provided to the Defendants as part of the unlawful financial arrangements.

93.     Furthermore, Khlevner never met the Referring Providers who purportedly issued prescriptions that were used to bill Liberty Mutual.  Instead, the prescriptions for the Fraudulent Equipment were procured by the Defendants as a result of arrangements with others not presently identifiable.

94.     Additionally, the Defendants obtained prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds. In some instances, without any involvement by the Referring Provider, the prescriptions purportedly issued by the Referring Providers were provided directly to the Defendants from persons working at or associated with the Clinics.

95.     To the extent that the Insureds received any Fraudulent Equipment, in many cases, the Insureds were provided with Fraudulent Equipment directly from the Clinics without any interaction with the Defendants.

96.     In all the claims identified in Exhibits "1" and "2", the Defendants falsely represented that Fraudulent Equipment were provided pursuant to lawful prescriptions from healthcare providers, and were, therefore, eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

**D.      The Prescriptions Secured Pursuant to Predetermined Fraudulent Protocols**

97.     In addition to the Defendants' unlawful financial arrangements, the Defendants obtained prescriptions for Fraudulent Equipment issued pursuant to predetermined fraudulent protocols, which were designed to maximize the billing that Defendants could submit to

automobile insurers, including Liberty Mutual, rather than to treat or otherwise benefit the Insureds.

98.     In the claims identified in Exhibits "1" and "2", virtually all of the Insureds were involved in relatively minor and low impact "fender-bender" accidents, to the extent they were involved in any actual accidents at all.

99.     Concomitantly, virtually none of the Insureds identified in Exhibits "1" and "2", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems because of the relatively minor accidents they experienced or purported to experience.

100.    However, despite virtually all the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent they were actually injured at all – virtually all of the Insureds who treated with each of the Referring Providers were subject to extremely similar and extensive treatment, by multiple healthcare providers, including being issued prescriptions for Fraudulent Equipment.

101.    The prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibits "1" and "2" were pursuant to predetermined fraudulent protocols set forth at each Clinic, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

102.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

103.    In general, the Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers pursuant to the following predetermined fraudulent protocols:

23

- an Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

- the Insured would be seen by a Referring Provider;

- on the date of the first visit, the Referring Provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME and/or OD which was filled by Walmed Equipment;

- subsequently, the Insured would return to the Clinic for one or more additional evaluation and treatment by multiple other healthcare providers, and would be provided with at least one additional prescription for a predetermined set of DME and/or OD filled by Walmed Equipment and/or Northeast Medical, although the Referring Provider did not always treat the Insured on the date of the additional prescription for DME and/or OD; and

- at least one, if not more than one, prescription for DME and/or OD would be directly provided to the Defendants to fill and was without any involvement by the Insured.

104.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patient's individual symptoms or presentation.

105.    Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider may – but should not as a matter of course – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

106.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

107.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

108.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

109.    If a healthcare provider determines that DME and/or OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed and why any of the prescribed Fraudulent Equipment was medically necessary or how it would help the Insureds.

110.    Here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibits "1" and "2" that treated at a specific Clinic were issued prescriptions for a predetermined set of Fraudulent Equipment.

111.    Further, many of the prescriptions were purportedly issued on dates that the Insureds never even treated with the Referring Providers who purportedly issued the prescription.

112.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to predetermined fraudulent protocols, to the extent that there was a contemporaneously dated evaluation report, the evaluation report often failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill Liberty Mutual for the charges identified in Exhibits "1" and "2". Furthermore, the prescriptions typically contained vague and generic descriptions for DME and OD, which – as explained in more detail below – provided the Defendants with the opportunity to purportedly provide – and bill Liberty Mutual for

– whatever DME or OD they wanted. In addition, in order to conceal the scheme, the prescriptions purportedly issued by the Referring Providers were never given to the Insureds, and instead, the Insureds were provided with Fraudulent Equipment directly from the Clinic's receptionists or delivered directly to Insureds' homes without any interaction from the Defendants.

113.    Even more, and as also explained below in more detail, the charges to Liberty Mutual were not based upon prescriptions for medically necessary Fraudulent Equipment, because the Defendants purportedly provided Insureds with whatever DME or OD they wanted, even when the Fraudulent Equipment purportedly provided – and billed to Liberty Mutual – was not the item identified in the prescriptions purportedly issued by the Referring Providers.

114.    Further, certain prescriptions were not actually issued by the Referring Provider listed on the prescription.  Instead, in those circumstances, the prescriptions were issued by others who are not presently identifiable, without the Referring Providers issuing, signing, authorizing, or even knowing about such prescriptions.

115.    For the reasons set forth above, and below, in each of the claims identified  in Exhibits "1" and "2", the Defendants falsely represented that Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME or OD, and were, therefore, eligible to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the Defendants pursuant agreements with others who are not presently identifiable.

### 1.   The Predetermined Fraudulent Protocol at the Coney Island Clinic

116.    The Coney Island Clinic was one of several Clinics where Defendants conspired with others not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to a predetermined fraudulent protocol.

117.    After their involvement in minor "fender-bender" motor vehicle accidents, virtually all of the Insureds identified in Exhibits "1" and "2" who purportedly received treatment at the Coney Island Clinic were purportedly provided with initial examinations from a healthcare provider. After their purported initial examinations, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

118.    The Referring Providers who purportedly conducted an initial evaluation on the Insureds at the Coney Island Clinic did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

119.    Rather, the Referring Providers at the Coney Island Clinic purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol.

120.    Further, virtually every Insured who underwent an initial examination at the Coney Island Clinic received a prescription for virtually the same type of Fraudulent Equipment.

121.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, the Referring Providers purportedly prescribed, at a minimum, the following Fraudulent Equipment to virtually every Insured identified in Exhibit "1" treating at the Coney Island Clinic: (i) "Orthopedic Cervical Pillow"; (ii) "Cervical Collar"; (iii) "Orthopedic Lumbar Support"; (iv) "Shoulder Support"; (v) "Bed Board"; (vi) "Egg Crate Mattress"; (vii) "Orthopedic Lumbar Cushion"; and (viii) "Cold Circulation Unit with Pump."

122.    In addition to the items described above, Insureds would also occasionally be prescribed a: (i) "Thermophore" and (ii) "Knee Support".

123.    To the extent that the Insureds identified in Exhibit "1" returned to the Coney Island Clinic, they would virtually always be provided with additional prescriptions for an additional set

of Fraudulent Equipment purportedly issued by the Referring Providers. These would include: (i) "EMS 4 Unit Leads with Belt & Accessory"; (ii) "Massager"; and (iii) "Infrared Heating Lamp".

124.    In addition, the Referring Providers purportedly issued one or more separate additional prescriptions to Insureds for the following Fraudulent Equipment: (i) "Cervical Traction Set"; (ii) "LSO APL Control Custom Fitted"; (iii) "Shoulder Support Custom"; and (iv) "KO Rigid Adjustable Custom Fitted".

125.    Further, Insureds identified in Exhibit "2" would virtually always be provided with a prescription for an additional set of Fraudulent Equipment purportedly issued by the Referring Providers at the Coney Island Clinic. These would include: (i) "Pneumatic Compressor, segmental home model with calibrated gradient pressure" with (ii) "Segmental pneumatic appliance for use with pneumatic compressor, full arm"; and/or (iii) Segmental pneumatic appliance for use with pneumatic compressor, full leg".

126.    Additionally, certain Insureds identified in Exhibits "1" and "2" received multiple separate prescriptions for Fraudulent Equipment on a single date that were purportedly issued by the same Referring Provider.

127.    Multiple separate prescriptions were issued to the Insureds on a single date, and purportedly by the same Referring Provider, as part of the scheme between the Defendants and unidentifiable third-party individuals to provide the Defendants with the ability to submit separate bills to Liberty Mutual for reimbursement of No-Fault Benefits in a way to lower the amount charged to Liberty Mutual on each bill so the Defendants could avoid detection of their fraudulent schemes.

128.    In further keeping with the fact that the prescriptions for medically unnecessary Fraudulent Equipment purportedly issued to Insureds by the Referring Providers were pursuant to a predetermined fraudulent protocol, virtually every Insured who treated at the Coney Island Clinic

was issued at least one prescription for Fraudulent Equipment that was dated on a day that the Insured was not examined or otherwise treated by the Referring Provider who purportedly issued the prescription.

129.    For example:

(i)    On December 12, 2021, an Insured named DA was purportedly involved in a motor vehicle accident. DA purportedly started treating at the Coney Island Clinic on or around December 16, 2021. After Mindaugas Pranevicius, M.D. ("Pranevicius") purportedly performed an initial examination on DA, Pranevicius purportedly issued a prescription in the name of DA that was provided to Walmed Equipment that included the following Fraudulent Equipment: (i) "Orthopedic Cervical Pillow"; (ii) "Cervical Collar"; (iii) "Orthopedic Lumbar Support"; (iv) "Shoulder Support"; (v) "Bed Board"; (vi) "Egg Crate Mattress"; (vii) "Orthopedic Lumbar Cushion"; (viii) "Cold Circulation Unit with Pump"; and (ix) "Knee Support". On February 17, 2022, Vyacheslav Mamanov, NP ("Mamanov")  purportedly issued a prescription in the name of DA that was provided to Walmed Equipment for an "LSO APL Control Custom Fitted," despite Mamanov not performing any examination or treatment on DA on that day. On February 24, 2022, Binod Shah, M.D. ("Shah") purportedly issued a prescription in the name of DA that was provided to Walmed Equipment for: (i) "Shoulder Support Custom Fitted"; and (ii) "KO Rigid Adjustable Custom Fitted," despite Shah not performing any examination or treatment on DA on that day. On February 24, 2022, Mamanov purportedly issued a prescription in the name of DA that was provided to Northeast Devices for: (i) "Pneumatic Compressor"; (ii) "Segmental pneumatic appliance, full arm"; and (iii) "Segmental pneumatic appliance, full leg," despite Mamanov not performing any examination or treatment on DA on that day.

(ii)    On February 16, 2022, an Insured named LJ was purportedly involved in a motor vehicle accident. LJ purportedly started treating at the Coney Island Clinic on or around February 17, 2022. After Mamanov purportedly performed an initial examination on LJ, Mamanov purportedly issued a prescription in the name of LJ that was provided to Walmed Equipment that included the following Fraudulent Equipment: (i) "Orthopedic Cervical Pillow"; (ii) "Thermophore"; (iii) "Orthopedic Lumbar Support"; (iv) "Shoulder Support"; (v) "Bed Board"; (vi) "Egg Crate Mattress"; (vii) "Orthopedic Lumbar Cushion"; and (viii)  "Cold Circulation Unit with Pump." On March 7, 2022, Mamanov purportedly issued a prescription in the name of LJ that was provided to Northeast Devices for: (i) "Pneumatic Compressor"; and (ii) "Segmental pneumatic appliance, full arm," despite Mamanov not performing any examination or treatment on LJ on that day. On March 7, 2022, Shah also purportedly issued a prescription in the name

of LJ that was provided to Walmed Equipment for a "Shoulder Support Custom Fitted"; despite Shah not performing any examination or treatment on LJ on that day. On March 24, 2022, Mamanov purportedly issued two separate prescriptions in the name of LJ that was provided to Walmed Equipment for: (i) "EMS 4 Unit Leads with Belt & Accessory"; (ii) "Infrared Heating Lamp"; (iii) "Massager"; and (iv) "Cervical Traction Unit."

(iii)    On March 27, 2022, an Insured named DF was purportedly involved in a motor vehicle accident. DF purportedly started treating at the Coney Island Clinic on or around March 28, 2022. After Mamanov purportedly performed an initial examination on DF, Mamanov purportedly issued a prescription in the name of DF that was provided to Walmed Equipment that included the following Fraudulent Equipment: (i) "Orthopedic Cervical Pillow"; (ii) "Thermophore"; (iii) "Orthopedic Lumbar Support"; (iv) "Shoulder Support"; (v) "Bed Board"; (vi) "Egg Crate Mattress"; (vii) "Orthopedic Lumbar Cushion"; (viii) "Cold Circulation Unit with Pump"; (ix) "Cervical Collar"; and (x) "Knee Support." On April 14, 2022, Mamanov purportedly issued a prescription in the name of DF that was provided to Walmed Equipment for a "KO Rigid Adjustable Custom Fitted," despite Mamanov not performing any examination or treatment on DF on that day. On April 21, 2022, Mamanov purportedly issued a prescription in the name of DF that was provided to Walmed Equipment for: (i) "EMS 4 Unit Leads with Belt & Accessory"; (ii) "Infrared Heating Lamp"; and (iii) "Massager." On May 26, 2022, Mamanov purportedly issued a prescription in the name of DF that was provided to Walmed Equipment for a "Cervical Traction Set," despite Mamanov not performing any examination or treatment on DF on that day. On June 9, 2022, Mamanov purportedly issued two separate prescriptions in the name of DF that was provided to Walmed Equipment and Northeast Devices for: (i) "LSO APL Control Custom Fitted"; (ii) "Pneumatic Compressor"; (iii) "Segmental pneumatic appliance, full arm"; and (iv) "Segmental pneumatic appliance, full leg," despite Mamanov not performing any examination or treatment on DF on that day. On June 28, 2022, Shah Bikel, M.D. ("Bikel") purportedly issued a prescription in the name of DF that was provided to Walmed Equipment for: (i) "EMS 4 Unit Leads with Belt & Accessory"; (ii) "Infrared Heating Lamp"; and (iii) "Massager" – *the same DME prescribed on April 21, 2022.*

(iv)    On April 5, 2022, an Insured named DC was purportedly involved in a motor vehicle accident. DC purportedly started treating at the Coney Island Clinic on or around April 7, 2022. After Mamanov purportedly performed an initial examination on DC, Mamanov purportedly issued a prescription in the name of DC that was provided to Walmed Equipment that included the following Fraudulent Equipment: (i) "Orthopedic Cervical Pillow"; (ii) "Thermophore"; (iii) "Orthopedic Lumbar Support"; (iv) "Shoulder Support"; (v) "Bed Board"; (vi) "Egg Crate Mattress"; (vii) "Orthopedic

Lumbar Cushion"; (viii) "Cold Circulation Unit with Pump"; and (ix) "Knee Support." On April 28, 2022, Mamanov purportedly issued two separate prescriptions in the name of DC that was provided to Walmed Equipment for the following: (i) "KO Rigid Adjustable Custom Fitted"; (ii) "EMS 4 Unit Leads with Belt & Accessory"; (iii) "Infrared Heating Lamp"; and (iv) "Massager." On August 4, 2022, Bikel purportedly issued a prescription in the name of DC that was provided to Walmed Equipment for a "KO Rigid Adjustable Custom Fitted," despite Bikel not performing any examination or treatment on DC on that day. On August 23, 2022, Bikel purportedly issued a prescription in the name of DC that was provided to Northeast Devices for: (i) "Pneumatic Compressor"; (ii) "Segmental pneumatic appliance, full leg"; and (iii) "Segmental pneumatic appliance, waist," despite Bikel not performing any examination or treatment on DC on that day.

(v)     On May 16, 2022, an Insured named RS was purportedly involved in a motor vehicle accident. RS purportedly started treating at the Coney Island Clinic on or around May 19, 2022. After Mamanov purportedly performed an initial examination on RS, Mamanov purportedly issued a prescription in the name of RS that was provided to Walmed Equipment that included the following Fraudulent Equipment: (i) "Orthopedic Cervical Pillow"; (ii) "Thermophore"; (iii) "Orthopedic Lumbar Support"; (iv) "Shoulder Support"; (v) "Bed Board"; (vi) "Egg Crate Mattress"; (vii) "Orthopedic Lumbar Cushion"; (viii) "Cold Circulation Unit with Pump"; (ix) "Cervical Collar"; and (x) "Knee Support." On June 13, 2022, Mamanov purportedly issued a prescription in the name of RS that was provided to Walmed Equipment for the following: (i) "EMS 4 Unit Leads with Belt & Accessory"; (ii) "Infrared Heating Lamp"; (iii) "Massager"; and (iv) "Hydrotherapy Whirlpool." On June 28, 2022, Bikel purportedly issued two separate prescriptions in the name of RS that was provided to Walmed Equipment for: (i) "KO Rigid Adjustable Custom Fitted"; and (ii) "Cervical Traction Set," despite Bikel not performing any examination or treatment on RS on that day. On September 8, 2022, Bikel purportedly issued a prescription in the name of RS that was provided to Northeast Devices for: (i) "Pneumatic Compressor"; and (iii) "Segmental pneumatic appliance, full leg," despite Bikel not performing any examination or treatment on RS on that day.

(vi)    On October 14, 2021, an Insured named LC was purportedly involved in a motor vehicle accident. LC purportedly started treating at the Coney Island Clinic on or around October 21, 2021. After Yasmeen Khan, M.D. ("Khan") purportedly performed an initial examination on LC, Khan purportedly issued a prescription in the name of LC that was provided to Walmed Equipment that included the following Fraudulent Equipment: (i) "Orthopedic Lumbar Support"; (ii) "Shoulder Support"; (iii) "Bed Board"; (iv) "Egg Crate Mattress"; (v) "Orthopedic Lumbar Cushion"; and (vi) "Cold Circulation Unit with Pump." On November 9, 2021, John Greco,

M.D. ("Greco") purportedly issued a prescription in the name of LC that was provided to Walmed Equipment for the following: (i) "EMS 4 Unit Leads with Belt & Accessory"; (ii) "Infrared Heating Lamp"; and (iii) "Massager." On November 9, 2021, Greco purportedly issued two separate prescriptions in the name of LC that were provided to Walmed Equipment for: (i) "LSO APL Control Custom Fitted"; and (ii) "Cervical Traction Set." On November 16, 2021, Khan purportedly issued a prescription in the name of LC that was provided to Walmed Equipment for a "Shoulder Support custom," despite Khan not performing any examination or treatment on LC on that day. On December 2, 2021, Osvaldus Pranevicius, M.D. purportedly issued a prescription in the name of LC that was provided to Northeast Devices for: (i) "Pneumatic Compressor"; and (ii) "Segmental pneumatic appliance, full arm," despite not performing any examination or treatment on LC on that day.

(vii)   On March 6, 2022, an Insured named GM was purportedly involved in a motor vehicle accident. GM purportedly started treating at the Coney Island Clinic on or around March 7, 2022. After Mamamov purportedly performed an initial examination on GM, Mamamov purportedly issued a prescription in the name of GM that was provided to Walmed Equipment that included the following Fraudulent Equipment: (i) "Orthopedic Cervical Pillow"; (ii) "Thermophore"; (iii) "Orthopedic Lumbar Support"; (iv) "Shoulder Support"; (v) "Bed Board"; (vi) "Egg Crate Mattress"; (vii) "Orthopedic Lumbar Cushion"; (viii) "Cold Circulation Unit with Pump"; (ix) "Cervical Collar"; and (x) "Knee Support." On March 24, 2022, Mamanov purportedly issued two prescriptions in the name of GM that was provided to Walmed Equipment for the following: (i) "Shoulder support"; and (ii) "KO Rigid Adjustable Custom Fitted," despite Mamamov not performing any examination or treatment on GM on that day.  On March 28, 2022, Mamamov purportedly issued a prescription in the name of GM that was provided to Walmed Equipment for the following: (i) "EMS 4 Unit Leads with Belt & Accessory"; (ii) "Infrared Heating Lamp"; (iii) "Massager". On March 31, 2022, Mamamov purportedly issued a prescription in the name of GM that was provided to Walmed Equipment for: (i) "Shoulder Support Custom" and (ii) "LSO APL Control Custom Fitted," despite Mamamov not performing any examination or treatment on GM on that day. On April 14, 2022, Mamamov purportedly issued a prescription in the name of GM that was provided to Northeast Devices for: (i) "Pneumatic Compressor"; (ii) "Segmental pneumatic appliance, full leg"; and (iii) "Segmental pneumatic appliance, full arm," despite Mamamov not performing any examination or treatment on GM on that day.

(viii)   On July 8, 2022, an Insured named TB was purportedly involved in a motor vehicle accident. TB purportedly started treating at the Coney Island Clinic on or around July 20, 2022. After Bikel purportedly performed an initial examination on TB, Bikel purportedly issued a prescription in the name of TB that was provided to Walmed Equipment that included the following

Fraudulent Equipment: (i) "Orthopedic Cervical Pillow"; (ii) "Thermophore"; (iii) "Orthopedic Lumbar Support"; (iv) "Shoulder Support"; (v) "Bed Board"; (vi) "Egg Crate Mattress"; (vii) "Orthopedic Lumbar Cushion"; (viii) "Cold Circulation Unit with Pump"; (ix) "Cervical Collar"; and (x) "Knee Support." On August 4, 2022, Bikel purportedly issued a prescription in the name of TB that was provided to Walmed Equipment for a "Shoulder support," despite Bikel not performing any examination or treatment on TB on that day. On August 11, 2022, Bikel purportedly issued a prescription in the name of TB that was provided to Walmed Equipment for the following: (i) "EMS 4 Unit Leads with Belt & Accessory"; (ii) "Infrared Heating Lamp"; (iii) "Massager". On August 18, 2022, Bikel purportedly issued a prescription in the name of TB that was provided to Walmed Equipment for: (i) "KO Rigid Adjustable Custom Fitted"; (ii) "LSO APL Control Custom Fitted"; and (iii) "Cervical Traction Set," despite Bikel not performing any examination or treatment on TB on that day. On August 23, 2022, Bikel purportedly issued a prescription in the name of TB that was provided to Northeast Devices for: (i) "Pneumatic Compressor"; (ii) "Segmental pneumatic appliance, full leg"; and (iii) "Segmental pneumatic appliance, full arm," despite Bikel not performing any examination or treatment on TB on that day.

(ix)     On December 12, 2021, an Insured named OS was purportedly involved in a motor vehicle accident. OS purportedly treated at the Coney Island Clinic on or around January 11, 2022. After Pranevicius purportedly performed an examination on OS, Pranevicius purportedly issued two separate prescriptions in the name of OS that was provided to Walmed Equipment that included the following Fraudulent Equipment: (i) "EMS 4 Unit Leads with Belt & Accessory"; (ii) "Infrared Heating Lamp"; (iii) "Massager"; and (iv) "Shoulder Support Custom". On January 18, 2022, Mamanov purportedly issued a prescription in the name of OS that was provided to Walmed Equipment for: (i) "Cervical Traction Unit"; and (ii) "LSO APL Control Custom Fitted," despite Mamanov not performing any examination or treatment on OS on that day. On January 26, 2022, Pranevicius purportedly issued a prescription in the name of OS that was provided to Northeast Devices for: (i) "Pneumatic Compressor"; and (ii) "Segmental pneumatic appliance, full arm," despite Pranevicius not performing any examination or treatment on OS on that day.

(x)     On June 29, 2022, an Insured named MS was purportedly involved in a motor vehicle accident. MS purportedly started treating at the Coney Island Clinic on or around August 4, 2022. After Bikel purportedly performed an initial examination on MS, Bikel purportedly issued a prescription in the name of MS that was provided to Walmed Equipment that included the following Fraudulent Equipment: (i) "EMS 4 Unit Leads with Belt & Accessory"; (ii) "Infrared Heating Lamp"; (iii) "Massager"; and (iv) "Hydrotherapy Whirlpool." On August 8, 2022, Bikel purportedly issued a prescription in the name of MS that was provided to Walmed Equipment

for an "LSO APL Control Custom Fitted," despite not performing any examination or treatment on MS on that day. On August 18, 2022, Bikel purportedly issued a prescription in the name of MS that was provided to Walmed Equipment for a "Cervical Traction Set," despite not performing any examination or treatment on MS on that day. On August 23, 2022, Bikel purportedly issued a prescription in the name of MS that was provided to Northeast Devices for:  (i) "Pneumatic Compressor"; and (iii) "Segmental pneumatic appliance, full leg," despite not performing any examination or treatment on MS on that day.

130.    These are only representative samples.

131.    In fact, virtually all the Insureds identified in Exhibits "1" and "2" were issued prescriptions for the same type of Fraudulent Equipment pursuant to the predetermined fraudulent protocol identified above, despite the fact that they were involved in relatively minor and low-impact motor vehicle accidents.

132.    Furthermore, the contemporaneous dated initial examination or follow-up examination reports, oftentimes never identified all of the Fraudulent Equipment purportedly prescribed to the Insureds, if the report identified the Fraudulent Equipment at all. In fact, the reports did not contain any sufficient information to explain why any of the prescribed Fraudulent Equipment was medically necessary.

133.    To the extent that the contemporaneous reports issued by Referring Providers at the Coney Island Clinic did reference any of the Fraudulent Equipment prescribed, the evaluation reports virtually never contained any specific detail explaining why or how the prescribed Fraudulent Equipment would help the Insureds.

134.    Furthermore, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment or medical efficacy of the Fraudulent Equipment, including a response to such equipment, and virtually never provided any indication whether to continue using any of the previously prescribed Fraudulent Equipment.

135.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

136.    However, the follow-up examination reports from the Referring Providers at the Coney Island Clinic failed to include any meaningful information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date.

137.    Additionally, as part of the fraudulent scheme between the Defendants and unidentified third-party individuals, the prescriptions from the Coney Island Clinic were never given to the Insureds but were routed directly to the Defendants, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Coney Island Clinic, without any interaction with or instruction concerning their use from either the Defendants or a healthcare provider.

138.    The prescriptions from the Coney Island Clinic were also purposefully generic and vague to allow the Defendants to choose the specific type of Fraudulent Equipment that they purported to provide Insureds and bill Liberty Mutual and other New York automobile insurers, in order to increase their financial gain.

139.    By way of example, the prescriptions do not specify a type of cervical collar or lumbar support that patients should receive by providing a specific HCPCS Code – or a detailed description that could only be associated with one type of HCPCS Code. Instead, the prescriptions from the Coney Island Clinic contained the phrases "cervical collar" and "orthopedic lumbar

support", which provided the Defendants with the ability to select a specific type of support that was more highly priced and profitable.

      **E.**     **The Unlawful Distribution of Fraudulent Equipment to Insureds by the Walmed Equipment Defendants Without Valid Prescriptions**

140.    Walmed Equipment is not a licensed medical professional corporation, and Khlevner is not a licensed healthcare provider.  As such, the Walmed Equipment Defendants were never lawfully permitted to prescribe DME and OD to Insureds. For the same reason, the Walmed Equipment Defendants cannot have legally dispensed DME and/or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identified the DME and/or OD to be provided.

141.    However, in many of the fraudulent claims identified in Exhibit "1", the Walmed Equipment Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider to the extent that any DME or OD was provided to the Insureds.

142.    More specifically, the prescriptions for DME and/or OD issued by the Referring Providers and provided to the Walmed Equipment Defendants were vague and generic because the prescriptions did not definitively identify the DME and/or OD to be provided. For example, the vague and generic prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Walmed Equipment Defendants to a unique type of DME and/or OD.

143.    The vague and generic prescriptions purportedly issued by the Referring Providers were intended to and actually provided the Walmed Equipment Defendants with the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule.

144.    In addition, in many of the fraudulent claims identified in Exhibit "1", the Walmed Equipment Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider, because the Walmed Equipment Defendants provided Fraudulent Equipment that was not identified on the prescription.

145.    In a legitimate clinical setting, a DME/OD retailer would contact the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements in order to dispense the appropriate DME and/or OD prescribed to each patient.  By contrast, the Walmed Equipment Defendants here never contacted the Referring Provider to seek instruction and/or clarification, but rather made their own determination as to the specific Fraudulent Equipment purportedly provided to each Insured. Not surprisingly, the Walmed Equipment Defendants elected to provide the Insureds with Fraudulent Equipment that had a reimbursement rate in the higher-end of the permissible range under the Medicaid Fee Schedule.

146.    For example, many of the prescriptions that were used by the Walmed Equipment Defendants to support their charges contained a vague description of an "Orthopedic Lumbar Support (LSO)." However, this vague and generic language directly relates to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds.

147.    Because they were not licensed healthcare providers, the Walmed Equipment Defendants were not legally permitted to determine which of the HCPCS Codes were best suited for each Insured based upon a vague prescription for an "Orthopedic Lumbar Support."

148.    However, the Walmed Equipment Defendants never contacted the Referring Provider for clarification, and instead decided themselves which specific type of Fraudulent

Equipment they would bill Liberty Mutual for, and accordingly purportedly provide the Insureds based upon the vague and generic prescriptions for Fraudulent Equipment.

149.    In fact, every time the Walmed Equipment Defendants received a prescription from the Referring Providers for an "Orthopedic Lumbar Support (LSO)", the Walmed Equipment Defendants, as part of their scheme, billed Liberty Mutual using HCPCS Code L0627 requesting a reimbursement of $322.98, and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to Liberty Mutual.

150.    Furthermore, each and every time the Walmed Equipment Defendants received a prescription from the Referring Providers for a "LSO APL Control Custom Fitted", the Walmed Equipment Defendants billed Liberty Mutual using HCPCS Code L0632 requesting a reimbursement of $1,150.00, and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to Liberty Mutual.

151.    These are only representative examples. To the extent that the Walmed Equipment Defendants provided Fraudulent Equipment, they unlawfully prescribed the Fraudulent Equipment for virtually all of the claims identified in Exhibit "1" that are based upon vague and generic prescriptions, because the Walmed Equipment Defendants decided which specific items of DME and/or OD to provide to the Insureds.

152.    The Fraudulent Equipment provided to the Insureds by the Walmed Equipment Defendants was not based on: (i) prescriptions by licensed healthcare providers containing sufficient detail to identify unique types of DME and/or OD; or (ii) a determination by a licensed healthcare provider that the specific items dispensed to the Insureds were medically necessary. Rather, the Fraudulent Equipment identified in Exhibit "1" were the result of decisions made by the Defendants.

153.    In all the claims identified in Exhibit "1" that were based upon vague and generic language contained in the prescriptions, the Walmed Equipment Defendants falsely represented that the Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME and/or OD issued by healthcare providers with lawful authority to do so. To the contrary, the Fraudulent Equipment was purportedly provided by the Walmed Equipment Defendants' own determination of what unique types of Fraudulent Equipment to purportedly provide, and, thus, was not eligible for reimbursement of No-Fault Benefits.

**F.      The Walmed Equipment Defendants' Fraudulent Billing for DME and/or OD**

154.    The bills submitted to Liberty Mutual and other New York automobile insurers by the Walmed Equipment Defendants were also fraudulent in that they misrepresented the DME and OD purportedly provided to the Insureds.

155.    In the bills and other documents submitted to Liberty Mutual, the Walmed Equipment Defendants misrepresented that the prescriptions relating to the Fraudulent Equipment were based upon some legitimate arms-length relationship, when the prescriptions for Fraudulent Equipment were based upon the unlawful financial arrangements between the Walmed Equipment Defendants and others who are not presently identifiable.

156.    The Walmed Equipment Defendants also misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items, when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to the unlawful financial arrangements between the Defendants, John Doe Defendants, and others who are presently unidentifiable.

157.    Furthermore, the Walmed Equipment Defendants misrepresented in the bills submitted to Liberty Mutual that the Fraudulent Equipment purportedly provided to Insureds were

based upon prescriptions issued by licensed healthcare providers authorized to issue such prescriptions, when the Fraudulent Equipment purportedly provided were based upon decisions made by laypersons.

158.    As explained below, the bills submitted to Liberty Mutual by the Walmed Equipment Defendants misrepresented that: (i) the Fee Schedule items matched the HCPCS Codes identified in the bills to Liberty Mutual, when they did not; and (ii) the charges for Non-Fee Schedule items were for permissible reimbursement rates, when they were not.

**1.      Walmed Equipment Defendants' Fraudulently Misrepresented the Fee Schedule items Purportedly Provided**

159.    Each of the bills submitted to Liberty Mutual seeking payment for Fraudulent Equipment contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

160.    As indicated above, the New York Fee Schedule provides that the Medicaid Fee Schedule is used to determine the amount to pay for Fee Schedule items. The Medicaid Fee Schedule specifically defines the requirements for each HCPCS code used to bill for DME and/or OD.

161.    Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS Code for both Fee Schedule items and Non-Fee Schedule items.

162.    Because the bills submitted to Liberty Mutual contained specific HCPCS Codes, the Walmed Equipment Defendants represented that Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

163.    However, the billing submitted to Liberty Mutual for Fee Schedule items by the Walmed Equipment Defendants contained virtually identical misrepresentations in the HCPCS Codes that were used to bill for the Fraudulent Equipment.  More specifically, except for codes

relating to positioning pillows/cushions under HCPCS Code E0190 and electric heating pads under HCPCS Code E0215, in virtually all of the bills submitted to Liberty Mutual for Fee Schedule items, the Walmed Equipment Defendants fraudulently represented to Liberty Mutual that the HCPCS Codes were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds.

164.    The prescriptions from the healthcare providers also contained vague and generic terms for Fraudulent Equipment to be provided to the Insureds. By contrast, the Walmed Equipment Defendants submitted bills to Liberty Mutual containing HCPCS codes that represented a more expensive tier of Fee Schedule items than necessary and that could be provided based upon the type of equipment identified in the vague and generic prescriptions.

165.    As indicated above, the Walmed Equipment Defendants were provided with prescriptions purportedly issued by the Referring Providers pursuant to predetermined fraudulent protocols, which provided the Walmed Equipment Defendants with the opportunity to increase the amount they could bill Liberty Mutual for Fraudulent Equipment purportedly provided to the Insureds.

166.    Accordingly, the Walmed Equipment Defendants obtained vague and generic prescriptions for Fraudulent Equipment that permitted them to choose between multiple types of products that would fit the vague description contained on the prescription.

167.    Although several options were available to the Walmed Equipment Defendants based upon the vague and generic prescriptions, the Defendants virtually always billed Liberty Mutual – and likely other New York automobile insurers – using HCPCS Codes with higher reimbursement amounts than necessary, which was done solely for their financial benefit.

168.    However, despite billing for Fee Schedule items using HCPCS Codes that had higher than necessary reimbursement amounts, the HCPCS codes in the bills submitted to Liberty

Mutual severely misrepresented the type of Fee Schedule items purportedly provided to the Insureds.

169.    As identified in the claims contained within Exhibit "1", the Walmed Equipment Defendants frequently submitted bills to Liberty Mutual for Fraudulent Equipment that was purportedly "custom fitted" for each Insured when the Walmed Equipment Defendants never customized the Fraudulent Equipment as billed.

170.    For example, Walmed Equipment used the vague and generic language in the prescriptions purportedly issued from the Referring Providers to bill Liberty Mutual for the following: (i) a cervical collar using HCPCS Code L0180 with a charge of $233.00 per unit; (ii) a LSO APL Control Custom Fitted using HCPCS Code L0632 with a charge of $1,150.00 per unit; (iii) a shoulder orthosis custom using HCPCS Code L3674 with a charge of $896.92; (iv) a knee orthosis using HCPCS Code L1832 with a charge of $607.55 per unit; (v) a LSO using HCPCS Code L0627 with a charge of $322.98 per unit; (vi) a shoulder orthosis using HCPCS Code L3671 with a charge of $690.23; and (vii) a knee orthosis custom using HCPCS Code L1844 with a charge of $1,107.70.

171.    However, the bills to Liberty Mutual for HCPCS Codes L0180, L0632, L3674, L1832, L0627, L3671 and L1844 fraudulently misrepresented the type of Fraudulent Equipment the Walmed Equipment Defendants purportedly provided to Insureds, as the OD provided – to the extent that any OD was actually provided – were not reimbursable under the specific HCPCS Codes billed to Liberty Mutual.

172.    The products assigned to HCPCS Codes L0180, L0632, L3674, L1832, L0627, L3671 and L1844 are different types of OD that are required to be customized to fit a specific patient by an individual with expertise.

173.    However, despite billing Liberty Mutual – and likely other New York automobile insurers – using HCPCS Codes L0180, L0632, L3674, L1832, L0627, L3671 and L1844, the specific orthotic provided by the Walmed Equipment Defendants did not contain the requirements set forth in HCPCS Codes L0180, L0632, L3674, L1832, L0627, L3671 and L1844, because – at a minimum – the items were never customized to fit each patient.

174.    In fact, the Walmed Equipment Defendants did not, and could not have, custom fitted the OD as required. To the extent that any of the charges identified in Exhibit "1" for custom fitted OD, including the claims for HCPCS Codes L0180, L0632, L3674, L1832, L0627, L3671 and L1844, were provided, the Defendants did not customize the equipment as required by Palmetto.

175.    To help clarify the term "custom fitted", Palmetto defines a custom fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

176.    One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which is for off-the-shelf orthotic means that "the beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) fall into this category." See Palmetto, Correct Coding –

<u>Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) –</u>
<u>Revised.</u>

177.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." <u>See</u> Palmetto, <u>Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.</u>

178.    In the claims identified in Exhibit "1" for custom fitted OD, including the claims for HCPCS Codes L0180, L0632, L3674, L1832, L0627, L3671 and L1844, the Walmed Equipment Defendants fraudulently misrepresented that the Walmed Equipment Defendants provided the Insureds with OD that was custom fitted as defined by Palmetto, by a certified orthotist.

179.    Instead, the Fraudulent Equipment was provided without taking any action to custom-fit the OD to the Insureds. To the extent that the Walmed Equipment Defendants attempted to make any adjustments to the DME received by Insureds identified in Exhibit "1", the Walmed Equipment Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

180.    More importantly, Khlevner is not a certified orthotist and did not complete sufficient training to become a certified orthotist.

181.    The Walmed Equipment Defendants also fraudulently misrepresented other Fee Schedule items purportedly provided to Insureds and billed to Liberty Mutual to maximize profits.

182.    The claims identified in Exhibit "1" for HCPCS Code E2612 is an example of how the Walmed Equipment Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds.

183.    Each of the claims identified within Exhibit "1" for HCPCS Code E2612 contained a charge of $382.02 based upon a prescription for an "Orthopedic Lumbar Cushion."

184.    However, the product represented by HCPCS Code E2612 is defined as a general use wheelchair back cushion, width 22 inches or greater, which was never provided to Insureds.

185.    Despite billing Liberty Mutual – and other New York automobile insurers – using HCPCS Code E2612, the items provided by the Walmed Equipment Defendants were not cushions for use with a wheelchair.

186.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibit "1", who were provided with a cushion by the Walmed Equipment Defendants that was billed to Liberty Mutual under HCPCS Code E2612, were in a wheelchair.

187.    In fact, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

188.    Unlike the fraudulent charges for $382.02 for each orthopedic lumbar cushion billed under HCPCS Code E2612 – and in keeping with the fact that the fraudulent charges were part of the Walmed Equipment Defendants' common scheme to defraud Liberty Mutual and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

189.    In each of the claims where the Walmed Equipment Defendants billed for Fraudulent Equipment under HCPCS Code E2612, each of the bills fraudulently misrepresented that the Walmed Equipment Defendants provided the Insureds with equipment in response to a prescription for wheelchair cushion and that item satisfies the requirements of HCPCS Code E2612.

190.    The claims for HCPCS Code E0272 is another example of how the Walmed Equipment Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds.

191.    Each of the claims identified within Exhibit "1" for HCPCS Code E0272 contained a charge of $155.52 based upon prescriptions for an "egg crate mattress".

192.    However, the product represented by HCPCS Code E0272 is defined as a mattress, foam rubber, which is an actual mattress, not a mattress pad.

193.    Despite billing Liberty Mutual – and other New York automobile insurers – using HCPCS Code E0272, the items provided by the Walmed Equipment Defendants were not foam rubber mattresses as required by HCPCS Code E0272.

194.    By contrast, they were mattress pads/toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code E0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

195.    Unlike the fraudulent charges for $155.52 for each eggcrate mattress billed under HCPCS Code E0272, the Fee Schedule sets a maximum reimbursement rate of $19.48 for each mattress pad/topper billed under HCPCS Code E0199.

196.    In each of the claims where the Walmed Equipment Defendants billed for Fraudulent Equipment under HCPCS Code E0272, each of the bills fraudulently misrepresented

that the Walmed Equipment Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0272.

197.    The claims for HCPCS Code E0274 is another example of how the Walmed Equipment Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds.

198.    The Walmed Equipment Defendants routinely submitted charges of $101.85 using HCPCS Code E0274 based upon prescriptions for a "bed board."

199.    However, the product represented by HCPCS Code E0274 is defined as an over-bed table and is a table akin to those found in hospitals that permit a bed-bound individual the use of a table while confined to a bed.

200.    By contrast, the items provided were bed boards, or large, flat pieces of cardboard that are put under a mattress to make the mattress firmer and can keep the mattress from sinking. A bed board is listed under HCPCS Code E0273, which is a Non-Fee Schedule Item.

201.    Each of the bills for HCPCS Code E0274 fraudulently misrepresented that the Walmed Equipment Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0274.

202.    With the exception of the claims identified using HCPCS Codes E0190 and HCPCS Code E0215, the Walmed Equipment Defendants fraudulently misrepresented the HCPCS Codes identified in their billing for Fee Schedule items to Liberty Mutual in order to increase the amount of No-Fault Benefits they could obtain and were therefore not eligible to collect No-Fault Benefits in the first instance.

### 2.    Walmed Equipment Defendants Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items

203.    When the Walmed Equipment Defendants    submitted bills to Liberty Mutual for Non-Fee Schedule items, the Walmed Equipment Defendants requested reimbursement rates that

were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

204.    However, as part of the fraudulent scheme, the billing submitted to Liberty Mutual for the Non-Fee Schedule items by the Walmed Equipment Defendants contained virtually identical misrepresentations in the reimbursement amount sought from Liberty Mutual.

205.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as <u>the lesser of</u>: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

206.    By submitting bills to Liberty Mutual for Non-Fee Schedule items, the Walmed Equipment Defendants represented that they requested permissible reimbursement amounts that were calculated as <u>the lesser of</u>: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

207.    However, in virtually all of the charges to Liberty Mutual for Non-Fee Schedule items, the Walmed Equipment Defendants fraudulently represented to Liberty Mutual that the reimbursement sought was <u>the lesser of</u>: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

208.    Instead, the Walmed Equipment Defendants submitted bills to Liberty Mutual with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from Liberty Mutual and other automobile insurers.

209.    The Walmed Equipment Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds with low-cost and low-quality Fraudulent Equipment.

210.    When the Walmed Equipment Defendants submitted bills to Liberty Mutual seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of the Walmed Equipment Defendants' acquisition cost of purportedly high-quality items. In actuality, the Walmed Equipment Defendants' legitimate acquisition cost for the low-quality items were significantly less.

211.    The Walmed Equipment Defendants also either purposefully avoided researching the cost to the general public of the Non-Fee Schedule items that they purportedly provided, because they knew that those items would be sold at significantly less than the charges they submitted to Liberty Mutual and other automobile insurers, or they were aware that the cost to the general public of the Non-Fee Schedule items that they purportedly provided was significantly less than the charges they submitted to Liberty Mutual, and other automobile insurers, yet continued to misrepresent the amount of permissible reimbursement.

212.    The Walmed Equipment Defendants also purposefully attempted to conceal their effort to overcharge Liberty Mutual for Non-Fee Schedule items by virtually never submitting a copy of their acquisition invoices in conjunction with their bills.

213.    The Walmed Equipment Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to Liberty Mutual because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

214.    As part of their common scheme, the charges the Walmed Equipment Defendants submitted to Liberty Mutual for Non-Fee Schedule items virtually always misrepresented the permissible reimbursement amount.

215.    For example, the Walmed Equipment Defendants billed Liberty Mutual for infrared heating lamps under HCPCS Code E0205 with a charge of $225.90 per unit or falsely represented that as a permissible reimbursement amount for the Non-Fee Schedule item.

216.    To the extent that any items were provided, the infrared heating lamps were low quality items and the permissible reimbursement rate was significantly less than the $225.90 charged by the Walmed Equipment Defendants.

217.    In virtually all of the charges submitted to Liberty Mutual for infrared heating lamps, the Walmed Equipment Defendants fraudulently sought reimbursement for $225.90 per unit when the maximum reimbursement charge was significantly less.

218.    The Walmed Equipment Defendants fraudulently misrepresented in the bills submitted to Liberty Mutual for Non-Fee Schedule items that the charges were not in the Medicaid Fee Schedule and were the lesser of 150% of the acquisition cost or the cost to the general public. Therefore, the Walmed Equipment Defendants were not eligible to collect No-Fault Benefits in the first instance.

### G.    The Unlawful Dispensing of Fraudulent Equipment Through Northeast Devices

219.    Like the Walmed Equipment Defendants, the Northeast Defendants entered into illegal, collusive agreements with the Clinics and Referring Providers working at the Clinics and steered them to prescribe and direct large volumes of prescriptions (or purported prescriptions) to Northeast Devices for the specifically targeted Fraudulent Equipment, which equipment was purportedly prescribed and dispensed to treat patients at the Clinics.  This was done, not because the Fraudulent Equipment was reasonable and medically necessary – which it was not – but because of the unlawful financial arrangements between the Defendants, John Doe Defendants, and others who are presently unidentifiable.

220.     Unlike legitimate medical supply companies that dispense a variety of DME devices and healthcare related products, Northeast Devices intentionally focused on and targeted one specific item of DME – a Pneumatic Compression Device. Pneumatic Compression Devices, in fact, were the only item of DME (along with the associated appliances/sleeves) that Northeast Devices dispensed.

221.     As discussed in more detail below, Pneumatic Compression Devices consist of an inflatable garment/sleeve for the arm or leg and an electrical pneumatic pump that fills the garment with compressed air.  The garment is intermittently inflated and deflated with cycle times and pressures that vary between devices.  Various commercial insurers have issued policy bulletins that make clear that the use of a Pneumatic Compression Device is allowed only under limited circumstances, and The Centers for Medicare & Medicaid Services has published guidance stating that Pneumatic Compression Devices billed under E0652 are covered only for the treatment of lymphedema or for the treatment of chronic venous insufficiency with venous stasis ulcers.

222.     Notwithstanding the limited, accepted uses for Pneumatic Compression Devices, the Northeast Defendants repeatedly purported to dispense expensive Pneumatic Compression Devices, with a reimbursable charge of $4,910.98 per device, to numerous Insureds who did not suffer from lymphedema or chronic venous insufficiency with venous stasis ulcers, solely to maximize profits without regard to genuine patient care.

223.     By submitting bills to Liberty Mutual seeking No-Fault Benefits for the Fraudulent Equipment, seeking reimbursement under HCPCS Code E0652, the Northeast Defendants represented that they provided Insureds with a Pneumatic Compression Device that was medically necessary, as determined by a healthcare provider licensed to prescribe DME.

224.    In keeping with the fact that the Fraudulent Equipment was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, none of the Insureds suffered from lymphedema or chronic venous insufficiency with venous stasis ulcers.

225.    The prescriptions obtained by the Northeast Defendants that were generated at the Clinics were pre-printed prescription forms that were never given to the Insureds, but as part of the scheme, they were routed directly to the Northeast Defendants from the Clinics to ensure that the Insureds did not try to fill the prescriptions with legitimate DME retailers.

226.    In furtherance of the integrated scheme, the Northeast Defendants utilized the pre-printed prescription forms to justify the Northeast Defendants billing for the Pneumatic Compression Device and associated appliances, typically as follows:

| Description of Treatment | Fee Schedule Treatment Code | Charges |
|---|---|---|
| Pneumatic Compressor, Segmental Home Model With Calibrated Gradient Pressure | E0652 | $4,910.98 |
| Segmental Pneumatic Appliance For Use with Pneumatic Compressor, Full Leg | E0667 | $316.12 |
| Segmental Pneumatic Appliance For Use with Pneumatic Compressor, Full Arm | E0668 | $366.72 |

227.    As previously stated, Pneumatic Compressor Devices are devices used to treat lymphedema or chronic venous insufficiency with venous stasis ulcers.  The Centers for Medicare & Medicaid Services ("CMS") has published guidance making clear that the devices are medically necessary only in limited instances.  In particular, CMS states as follows:

> Pneumatic Compressor Devices coded as E0652 are used only in the treatment of lymphedema or for the treatment of chronic venous insufficiency with venous stasis ulcers.

I.    Lymphedema - A Pneumatic Compressor Device coded as E0650 or E0651 is covered for both primary and secondary lymphedema in beneficiaries with chronic and severe lymphedema when all of the following three requirements are met:

1. The beneficiary has a diagnosis of lymphedema as defined above, and
2. The beneficiary has persistence of chronic and severe lymphedema as identified by the documented presence of at least one of the following clinical findings:
    o Marked hyperkeratosis with hyperplasia and hyperpigmentation,
    o Papillomatosis cutis lymphostatica,
    o Deformity of elephantiasis,
    o Skin breakdown with persisting lymphorrhea,
    o Detailed measurements over time confirming the persistence of the lymphedema with a history evidencing a likely etiology, and

3. In addition to this documented persistence, the lymphedema is then documented to be unresponsive to other clinical treatment over the course of a required four-week trial.

A Pneumatic Compressor Device coded as E0652 is not covered for the treatment of lymphedema of the extremities alone even if the criteria in this section are met. Claims will be denied as not reasonable and necessary.

The documentation by the treating practitioner of the medical necessity of a pneumatic compression device must include:

- The patient's diagnosis and prognosis;
- Symptoms and objective findings, including measurements which establish the severity of the condition;
- The reason the device is required, including the treatments which have been tried and failed; and
- The clinical response to an initial treatment with the device

II.    Chronic Venous Insufficiency With Venous Stasis Ulcers (CVI) - A Pneumatic Compressor Device coded as E0650 or E0651 is covered for the treatment of CVI of the lower extremities only if the patient has all of the following:

- Edema in the affected lower extremity
- One or more venous stasis ulcer(s)
- The ulcer(s) have failed to heal after a six-month trial of conservative therapy directed by the treating practitioner.

A Pneumatic Compressor Device coded as E0652 is not covered for the treatment of CVI even if the criteria in this section are met. Claims will be denied as not reasonable and necessary.

III.    Lymphedema Extending Onto The Chest, Trunk And/or Abdomen – A segmented, calibrated gradient pneumatic compression device (HCPCS code E0652) is only covered when the individual has unique characteristics which prevent them from receiving adequate satisfactory pneumatic compression treatment using a nonsegmented device along with a segmented appliance or compression device without manual control of the pressure in each chamber.

A Pneumatic Compressor Device coded as E0652, is covered for the treatment of lymphedema extending onto the chest, trunk and/or abdomen when all of the following are met:

- The beneficiary has lymphedema of an extremity as defined above
- The coverage criteria for an E0650 or E0651 are met
- The beneficiary has lymphedema extending onto the chest, trunk and/or abdomen that extends past the limits of a standard compression sleeve, and the chest, trunk and/or abdominal lymphedema has failed to improve with a four-week trial.

A Pneumatic Compressor Device coded as E0652 used to treat lymphedema extending onto the chest, trunk and/or abdomen that does not meet all of the requirements above is not eligible for reimbursement. Claims will be denied as not reasonable and necessary.

A Pneumatic Compressor Device used for the prevention of venous thrombosis is a preventive service or function and are excluded from coverage.

See https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=33829.

228.    Upon information and belief, in the claims identified in Exhibit "2", substantially all of the Insureds whom the Northeast Defendants purported to provide Fraudulent Equipment for were involved in relatively minor and low-impact "fender-bender" accidents, to the extent they were involved in any actual accidents at all.

229.    In fact, none of the Insureds identified in Exhibit "2" whom the Northeast Defendants purported to provide the Fraudulent Equipment to suffered from lymphedema or chronic venous insufficiency with venous stasis ulcers or sustained any significant injuries or health problems as a result of the relatively minor accidents they experienced, or purported to experience, that required the use of a Pneumatic Compressor Device.

230. In keeping with the fact that the Insureds identified in Exhibit "2" suffered only minor injuries – to the extent they had any injuries at all – and had no reason to be prescribed a Pneumatic Compressor Device, virtually all of the Insureds identified on Exhibit "2" sustained soft tissue injuries, such as sprains and strains.

231. Contrary to the limited instances where a Pneumatic Compressor Device might be medically necessary, and in support of the fact that the prescriptions used by the Northeast Defendants were the result of predetermined fraudulent protocols, these devices were prescribed to Insureds with a "lifetime need."  For example:

(i)     On June 13, 2022, an Insured name SR was purportedly involved in an automobile accident. Thereafter, Amira Nasser purportedly issued a prescription that was provided to Northeast Devices for the lifetime need of the Fraudulent Equipment, including: (i) Pneumatic Compressor, Segmental Home Model With Calibrated Gradient Pressure; (ii) Segmental Pneumatic Appliance For Use With Pneumatic Compressor, Full Leg; and (iii) Segmental Pneumatic Appliance For Use with Pneumatic Compressor, Waist, despite there being no clinical medical justification for issuing SR the prescription, let alone the lifetime need of such Fraudulent Equipment;

(ii)    On March 6, 2022, an Insured name GM was purportedly involved in an automobile accident. Thereafter, Vyacheslav Mamanov, NP, purportedly issued a prescription that was provided to Northeast Devices for the lifetime need of the Fraudulent Equipment, including: (i) Pneumatic Compressor, Segmental Home Model With Calibrated Gradient Pressure; (ii) Segmental Pneumatic Appliance For Use With Pneumatic Compressor, Full Leg; and (iii) Segmental Pneumatic Appliance For Use With Pneumatic Compressor, Full Arm, despite there being no clinical medical justification for issuing GM the prescription, let alone the lifetime need of such Fraudulent Equipment;

(iii)   On August 31, 2022, an Insured name SH was purportedly involved in an automobile accident. Thereafter, Nick Nicoloff, P.A., purportedly issued a prescription that was provided to Northeast Devices for the lifetime need of the Fraudulent Equipment, including: (i) Pneumatic Compressor, Segmental Home Model With Calibrated Gradient Pressure; (ii) Segmental Pneumatic Appliance For Use With Pneumatic Compressor, Full Leg; (iii) Segmental Pneumatic Appliance For Use with Pneumatic Compressor, Waist; and (iv) Segmental Pneumatic Appliance For Use With Pneumatic Compressor, Full Arm, despite there being no clinical medical justification

for issuing SH the prescription, let alone the lifetime need of such Fraudulent Equipment;

(iv)     On July 28, 2022, an Insured name RM was purportedly involved in an automobile accident. Thereafter, Gamil Kostandy, M.D. purportedly issued a prescription that was provided to Northeast Devices for the lifetime need of the Fraudulent Equipment, including: (i) Pneumatic Compressor, Segmental Home Model With Calibrated Gradient Pressure; and (ii) Segmental Pneumatic Appliance For Use With Pneumatic Compressor, Full Leg, despite there being no clinical medical justification for issuing RM the prescription, let alone the lifetime need of such Fraudulent Equipment; and

(v)      On April 5, 2022, an Insured name DC was purportedly involved in an automobile accident. Thereafter, Shai Bikel, M.D., purportedly issued a prescription that was provided to Northeast Devices for the lifetime need of the Fraudulent Equipment, including: (i) Pneumatic Compressor, Segmental Home Model With Calibrated Gradient Pressure; and (ii) Segmental Pneumatic Appliance For Use With Pneumatic Compressor, Full Leg, despite there being no clinical medical justification for issuing DC the prescription, let alone the lifetime need of such Fraudulent Equipment;

232.    These are only representative examples.

233.    Despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent the Insureds were actually injured at all – the Insureds identified in Exhibit "2" were all prescribed or referred the Fraudulent Equipment that was dispensed by Northeast Devices.

234.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints would be evaluated, and the treating provider would direct a specific course of treatment based upon the patients' individual symptoms or presentation.

235.    Furthermore, in a legitimate setting, during the course of a patient's treatment, the provider may – but does not always – provide DME that would aid in the treatment of the patient's symptoms.  The specific DME that would be prescribed to aid the treatment of the patient would always directly relate to the patients' individual symptoms or presentation.

236.     Additionally -- and again in a legitimate setting -- when a patient is prescribed DME by a healthcare provider, the healthcare provider would indicate in a contemporaneous evaluation report what specific DME was prescribed and why.  Such information is typically included in a contemporaneous report so the healthcare provider can recall what he or she previously prescribed and provide proper follow-up questions during a subsequent evaluation.

237.     In keeping with the fact that the prescriptions for the Fraudulent Equipment provided to Insureds were not medically necessary and provided pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports written by healthcare providers virtually never made any reference to the Fraudulent Equipment being prescribed, nor was there any information to explain why the healthcare provider was prescribing the Fraudulent Equipment.

238.     Furthermore, to the extent that Insureds returned for a follow-up examination, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment.

239.     In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or adjust the patient's treatment as necessary.

240.     However, the follow-up examination reports from healthcare providers virtually always failed to include any information regarding Fraudulent Equipment prescribed to the Insureds identified in Exhibit "2" on a prior date.

241.     In every claim identified in Exhibit "2", the Fraudulent Equipment was prescribed pursuant to predetermined protocols designed to maximize profits to the Defendants, John Doe Defendants, as well as others presently unidentifiable, and not based upon medical necessity.

### III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to Liberty Mutual

242.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and/or treatment reports to Liberty Mutual through and in the names of Walmed Equipment and Northeast Devices, seeking payment for Fraudulent Equipment.

243.    The NF-3 forms, HCFA-1500 forms and treatment reports that Defendants submitted or caused to be submitted to Liberty Mutual were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to Liberty Mutual that the Defendants provided Fraudulent Equipment pursuant to valid prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD and, therefore, were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of the Fraudulent Equipment, they were not properly licensed.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to Liberty Mutual that the Defendants provided Fraudulent Equipment pursuant to valid prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD and, therefore, were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent provided at all, the Fraudulent Equipment was based upon: (a) unlawful financial arrangements with others who are not presently identifiable; (b) predetermined fraudulent protocols without regard for the medical necessity of the items; and (c) decisions made by laypersons not based upon lawful prescriptions from licensed healthcare providers for medically necessary items.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to Liberty Mutual that the Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and, therefore, were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent provided at all – the Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, treatment notes, and

delivery receipts.

(iv)     The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to Liberty Mutual the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that the Defendants provided any Fraudulent Equipment at all, and, therefore, were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits, because they falsified the permissible reimbursement amounts for Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

## IV.  **The Defendants' Fraudulent Concealment and Liberty Mutual's Justifiable Reliance**

244.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to Liberty Mutual.

245.    To induce Liberty Mutual to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

246.    Specifically, they knowingly misrepresented that they were lawfully licensed, even though they never complied with regulations requiring the Supplier Defendants to obtain a Dealer in Products License from the DCA.

247.    The Defendants also knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were not valid prescriptions based upon medical necessity but were obtained by Defendants as the result of unlawful financial arrangements and, ultimately used as the basis to submit bills to Liberty Mutual in order to prevent Liberty Mutual from discovering that Fraudulent Equipment was billed to Liberty Mutual for financial gain as part of a common fraudulent scheme.

248.    Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment provided to the Defendants were not based upon medical

necessity but rather, based upon predetermined fraudulent protocols and ultimately used as the basis to submit bills to Liberty Mutual in order to prevent Liberty Mutual from discovering that Fraudulent Equipment was billed to Liberty Mutual for financial gain as part of a common fraudulent scheme.

249.    Furthermore, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME/OD, and not by an actual healthcare provider's prescription for medically necessary DME/OD, in order to prevent Liberty Mutual from discovering that Fraudulent Equipment was billed to Liberty Mutual for financial gain as part of a common fraudulent scheme.

250.    Even more, the Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Walmed Equipment Defendants to Liberty Mutual did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in order to prevent Liberty Mutual from discovering that Fraudulent Equipment was billed to Liberty Mutual for financial gain as part of a common fraudulent scheme.

251.    Lastly, the Defendants knowingly misrepresented the permissible reimbursement amount regarding the Non-Fee Schedule items contained in the bills submitted to Liberty Mutual by the Walmed Equipment Defendants, and did not include any invoices to support the charges in order to prevent Liberty Mutual from discovering that Non-Fee Schedule items were billed to Liberty Mutual for financial gain as part of a common fraudulent scheme.

252.    Liberty Mutual maintains standard office practices and procedures that are designed to and do ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

253.    In accordance with the No-Fault Laws, and Liberty Mutual's standard office practices and procedures, Liberty Mutual either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Supplier Defendants; (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the Supplier Defendants; (iii) timely issued payment with respect to the claims submitted through the Supplier Defendants; or else (iv) the time in which to pay or deny the pending claims of No-Fault Benefits submitted through the Supplier Defendants, or to request additional verification of those claims, has not expired.

254.    The Defendants also hired law firms to pursue collection of the fraudulent charges from Liberty Mutual and other insurers. These law firms routinely filed expensive and time-consuming litigation and arbitration against Liberty Mutual and other insurers if the charges were not promptly paid in full.

255.    The Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

256.    Liberty Mutual is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to Liberty Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause Liberty Mutual to rely upon them. As a result, Liberty Mutual incurred damages of more than $184,000.00 based upon the fraudulent charges representing payments made by Liberty Mutual to the Supplier Defendants.

257. Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from Liberty Mutual, Liberty Mutual did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Walmed Equipment and Northeast Devices**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

258. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

259. There is an actual case in controversy between Liberty Mutual and the Supplier Defendants (Walmed Equipment and Northeast Devices) regarding more than $530,000.00 in pending fraudulent no-fault insurance billing, including (i) more than $352,000.00 in fraudulent billing that has been submitted to Liberty Mutual in the name of Walmed Equipment, and (ii) more than $178,000.00 in fraudulent billing that has been submitted to Liberty Mutual in the name of Northeast Devices.

260. Walmed Equipment and Northeast Devices have no right to receive payment for any pending bills submitted to Liberty Mutual because they did not comply with all local licensing laws as they failed to obtain Dealer in Products Licenses, and thus, were never properly or lawfully licensed by the DCA, as required by regulations from the City of New York.

261. Walmed Equipment and Northeast Devices also have no right to receive payment for any pending bills submitted to Liberty Mutual, because the bills submitted to Liberty Mutual for Fraudulent Equipment were based not upon medical necessity, but rather, as a result of its participation in unlawful financial arrangements.

262. Walmed Equipment and Northeast Devices have no right to receive payment for any pending bills submitted to Liberty Mutual because the bills submitted to Liberty Mutual were

based not upon medical necessity, but rather pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants and others who are not presently known, rather than to treat the Insureds.

263.     Walmed Equipment and Northeast Devices have no right to receive payment for any pending bills submitted to Liberty Mutual, because Walmed Equipment and Northeast Devices purportedly provided Fraudulent Equipment as a result of decisions that were made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

264.     Walmed Equipment has no right to receive payment for any pending bills submitted to Liberty Mutual because – to the extent provided at all – Walmed Equipment fraudulently misrepresented the Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fee Schedule items provided to the Insureds.

265.     Walmed Equipment has no right to receive payment for any pending bills submitted to Liberty Mutual because – to the extent provided at all – Walmed Equipment fraudulently misrepresented that the charges for Non-Fee Schedule items contained within the bills to Liberty Mutual were less than or equal to the maximum permissible reimbursement amount.

266.     Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual under the names of Walmed Equipment and Northeast Devices.

**SECOND CAUSE OF ACTION**
**Against Walmed Equipment, Khlevner, and John Doe Defendants**
**(Common Law Fraud)**

267.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

268.    Walmed Equipment, Khlevner, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

269.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that Walmed Equipment was lawfully licensed and entitled to No-Fault Benefits, when, in fact, Walmed Equipment was never lawfully licensed as it failed to obtain a Dealer in Products License; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD, when, in fact, the prescriptions were provided as a result of unlawful financial arrangements and unauthorized, and not based upon medical necessity, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD, when, in fact, the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that it was dispensed based upon proper prescriptions by licensed healthcare providers, when, in fact, the Fraudulent Equipment was dispensed based on decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was provided at all, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to Liberty Mutual, when, in fact, Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; and (vi) in many claims, to the extent that any Fraudulent Equipment was provided at all, the charges for Non-Fee Schedule items contained in the bills to Liberty Mutual misrepresented the permissible amount of reimbursement. A representative sample

of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

270.     Walmed Equipment, Khlevner, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Walmed Equipment that were not compensable under the No-Fault Laws.

271.     Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $157,000.00 pursuant to the fraudulent bills submitted by Khlevner and the John Doe Defendants through Walmed Equipment.

272.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

273.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Walmed Equipment, Khlevner, and John Doe Defendants**
**(Unjust Enrichment)**

274.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

275.     As set forth above, the Defendants and John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

276.     When Liberty Mutual paid the bills and charges submitted by or on behalf of Walmed Equipment for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

277.     Walmed Equipment, Khlevner, and the John Doe Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that the Walmed Equipment, Khlevner, and the John Doe Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

278.     Walmed Equipment, Khlevner, and the John Doe Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

279.     By reason of the above, Walmed Equipment, Khlevner, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $157,000.00.

**FOURTH CAUSE OF ACTION**
**Against Northeast Devices, Khlevner, and John Doe Defendants**
**(Common Law Fraud)**

280.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

281.     Northeast Devices, Khlevner, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

282.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that Northeast Devices was lawfully licensed and entitled to No-Fault Benefits, when, in fact, Northeast Devices was never lawfully licensed as it failed to obtain a Dealer in Products License; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD, when, in fact, the prescriptions were provided as a result of unlawful financial arrangements and unauthorized, and not based upon medical necessity, which were used to financially enrich those that participated in the scheme; (iii)

in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD, when, in fact, the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that it was dispensed based upon proper prescriptions by licensed healthcare providers, when, in fact, the Fraudulent Equipment was dispensed based on decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that any Fraudulent Equipment was provided at all, that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to Liberty Mutual, when, in fact, Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to Liberty Mutual; and (vi) in many claims, to the extent that any Fraudulent Equipment was provided at all, the charges for Non-Fee Schedule items contained in the bills to Liberty Mutual misrepresented the permissible amount of reimbursement. A representative sample of the fraudulent billings and corresponding mailings submitted to Liberty Mutual identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

283.   Northeast Devices, Khlevner, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Northeast Devices that were not compensable under the No-Fault Laws.

284.   Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $27,000.00 pursuant to the fraudulent bills submitted by Khlevner and the John Doe Defendants through Northeast Devices.

285.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

286.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Northeast Devices, Khlevner, and John Doe Defendants**
**(Unjust Enrichment)**

287.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

288.     As set forth above, the Defendants and John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

289.     When Liberty Mutual paid the bills and charges submitted by or on behalf of Northeast Devices for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

290.     Northeast Devices, Khlevner, and the John Doe Defendants have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Northeast Devices, Khlevner, and the John Doe Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

291.     Northeast Devices, Khlevner, and the John Doe Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity and good conscience.

292.     By reason of the above, Northeast Devices, Khlevner, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $27,000.00.

**JURY DEMAND**

293.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Walmed Equipment and Northeast Devices, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Walmed Equipment and Northeast Devices have no right to receive payment for any pending bills submitted to Liberty Mutual;

B.    On the Second Cause of Action against Walmed Equipment, Khlevner and John Doe Defendants, more than $157,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

C.    On the Third Cause of Action against Walmed Equipment, Khlevner and John Doe Defendants, more than $157,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

D.    On the Fourth Cause of Action against Northeast Devices, Khlevner, and John Doe Defendants, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $27,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

E.    On the Fifth Cause of Action against Northeast Devices, Khlevner and John Doe Defendants, more than $27,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:  September 22, 2023
        Uniondale, New York

RIVKIN RADLER LLP


By: _Barry I. Levy_____
        Barry I. Levy, Esq.
        Michael A. Sirignano, Esq.
        Frank P. Tiscione, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Liberty Mutual Insurance
Company, Liberty Mutual Fire Insurance Company,
Liberty Insurance Corporation, The First Liberty
Insurance Corporation, LM Insurance Corporation,
Liberty Mutual Mid-Atlantic Insurance Company,
Liberty County Mutual Insurance Company, LM
Property and Casualty Insurance Company, Safeco
Company of Indiana, and American States
Insurance Company*